DONALD CRAIG MITCHELL
1335 F Street
Anchorage, Alaska 99501
(907) 276-1681
dcraigm@aol.com

Attorney for Plaintiffs

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ALASKA

BRIAN HOLL, JULIE JORLETT, JOHN )
SARVELA, MARILYN SARVELA, SEAN )
BARNETT, LORI BARNETT, DUSTIN )
LOUGHMAN, and TIFFANI LOUGHMAN, )
 )
   Plaintiffs, )
 )
v. )
 )Case No. 3:24-cv-0273-HRH
SHARON AVERY, in her official )
capacity as Acting Chairwoman )
of the National Indian Gaming )
Commission, and NATIVE VILLAGE )
OF EKLUTNA, )
 )
   Defendants. )
_____)

## COMPLAINT
(5 U.S.C. 706)

The plaintiffs allege:

### INTRODUCTION

1. This is a civil action that requests the court to enter a
declaratory judgment that the final agency action taken on July
18, 2024 by defendant Sharon Avery, the Acting Chairwoman of the
National Indian Gaming Commission (NIGC), in which defendant
Avery approved a gaming ordinance that defendant Native Village
of Eklutna (NVE) had submitted to the NIGC on April 22, 2024 was

void *ab initio* and is set aside on the ground that the action was taken in excess of defendant Avery's statutory authority.

**JURISDICTION AND VENUE**

2. The court has jurisdiction over the subject matter of this civil action pursuant to 28 U.S.C. 1331 (federal question) and 25 U.S.C. 2714 (right to district court review of a final agency decision made by the NIGC pursuant to 25 U.S.C. 2710).

3. Because this civil action seeks relief other than money damages and in their complaint the plaintiffs allege that defendant Avery acted in her official capacity with respect to the final agency action that is the subject of the action, pursuant to 5 U.S.C. 702 and 704 the United States has waived its sovereign immunity. The interest of the plaintiffs that they seek to protect by filing this civil action is within the zone of interests that Congress intended to protect by subjecting to judicial review the validity of final agency action taken pursuant to 25 U.S.C. 2710.

4. Pursuant to 28 U.S.C. 1391(b)(1) and (e)(1), this court is a proper venue for this civil action. Defendant Native Village of Eklutna is headquartered in, and the Ondola allotment is located in, the District of Alaska.

5. Pursuant to 28 U.S.C. 2201(a), the court may enter a judgment declaring that the final agency action whose validity is

2

the subject of this civil action was void *ab initio* and is set aside.

**PARTIES**

**Plaintiffs**

6. Plaintiff Brian Holl is a resident of the State of Alaska who resides in his home on Alluvial Street in the Birchwood Spur Road neighborhood of the Municipality of Anchorage in which he has resided since 1997.

7. Plaintiff Julie Jorlett is a resident of the State of Alaska who resides in her home on Alluvial Street in the Birchwood Spur Road neighborhood of the Municipality of Anchorage in which she has resided since 2017.

8. Plaintiffs John Sarvela and Marilyn Sarvela are residents of the State of Alaska who reside in their home on Alluvial Street in the Birchwood Spur Road neighborhood of the Municipality of Anchorage in which they have resided since 1975.

9. Plaintiffs Sean Barnett and Lori Barnett are residents of the State of Alaska who reside in their home on Sean Street (a half-block long dead end road that connects to Alluvial Street) in the Birchwood Spur Road neighborhood of the Municipality of Anchorage in which they have resided since 1977.

10. Plaintiffs Dustin Loughman and Tiffani Loughman are residents of the State of Alaska who reside in their home on Alluvial Street in the Birchwood Spur Road neighborhood of the

3

Municipality of Anchorage in which they have resided since 2016.

11. The Birchwood Spur Road neighborhood of the Municipality of Anchorage is a sparsely populated, heavily timbered, rural neighborhood. Alluvial Street is a dead end road. As a consequence, the plaintiffs's only access to and from their homes on Alluvial and Sean Streets is Birchwood Spur Road, which connects to Birchwood Loop Road. From the intersection with Alluvial Street, Birchwood Spur Road (which becomes Birchwood Loop Road) is a narrow, sparsely traveled, poorly lit, two-lane road that with multiple curves winds uphill for 1.3 miles to the North Birchwood exit of the Glenn Highway. The intersection of Alluvial Street with Birchwood Spur Road is two hundred and twenty yards south of the location on Birchwood Spur Road at which the Ondola allotment is located.

12. If this court does not set aside the final agency action whose validity is the subject of this civil action, defendant Native Village of Eklutna will construct, and on its behalf the Marnell Gaming Management Company will manage, a 50,000 square foot casino on the Ondola allotment whose gaming floor will contain seven hundred class II video gaming machines whose software has been programmed to play bingo and pull-tabs. The casino also will contain a bar and restaurant. That will inflict a direct, concrete, particularized, actual, and immediate injury in fact on the plaintiffs in that

4

a. The NVE intends the seven hundred video gaming machines in its casino to attract hundreds of patrons who seven days a week will constantly travel in automobiles from the North Birchwood Exit of the Glenn Highway down Birchwood Loop Road to Birchwood Spur Road, then past the intersection of Alluvial Street and Birchwood Spur Road, to the casino. And then back again. That will irreversibly destroy the quiet family atmosphere and rural lifestyle in the Birchwood Spur Road neighborhood that the plaintiffs decades ago moved into the neighborhood to enjoy;

b. Since the plaintiffs's homes are located in close proximity to the casino, the traffic congestion, alcohol impaired drivers, bright lights, noise, and increase in crime the casino will engender will decrease the market value of the plaintiffs's homes; and

c. The Ondola allotment on which the casino will be located abuts Peters Creek, an important salmon spawning stream and a natural resource the plaintiffs have long enjoyed. Because the Municipality of Anchorage does not provide water and waste disposal services to homes in the

5

Birchwood Spur Road neighborhood, the plaintiffs's homes and all other homes in the neighborhood each has its own water well and septic system. Similarly, defendant NVE will drill its own water well and install its own septic system in order to provide water and waste disposal for a casino that it intends will daily have hundreds of patrons, plus a presently unknown (except to the Marnell Gaming Management Company) number of employees. A septic system drain field expansive enough to accommodate that many patrons and employees, when combined with the run-off from a parking lot large enough to accommodate hundreds of automobiles, will adversely affect, not only Peters Creek, but the entire Peters Creek watershed.

**Defendants**

13. Defendant Sharon Avery is the Acting Chairwoman of the National Indian Gaming Commission, the federal agency Congress created to administer the Indian Gaming Regulatory Act (IGRA). Acting in her official capacity, on July 18, 2024 defendant Avery took the final agency action whose validity is the subject of this civil action.

14. Defendant Native Village of Eklutna is an unincorporated association that was created in 1988. Initially, the membership

of defendant NVE was composed of individuals of "Eklutna Native heritage" who between 1972 and 1973 had enrolled as shareholders of Eklutna, Inc., the for-profit business corporation that in 1972 had been incorporated under the Alaska Corporate Code and pursuant to the Alaska Native Claims Settlement Act, as well as the children of those individuals. In 1996 defendant NVE expanded its membership to include Alaska Natives who beginning in 1940 had occupied or owned a house in the community of Eklutna, as well as all "biologic descendants" (rather than just the children) of all members. Today, defendant NVE has 400 members, 75 of whom reside in the community of Eklutna.

## STATUTORY BACKGROUND

### Indian Gaming Regulatory Act

15. The Indian Gaming Regulatory Act, 25 U.S.C. 2701 *et seq.*, which Congress enacted in 1988, authorizes an "Indian tribe" to engage in class II gaming on the tribe's "Indian lands" if the tribe's governing body adopts a gaming ordinance that then is approved by the chair of the NIGC.

16. Section 4(5) of the IGRA, 25 U.S.C. 2703(5), defines "Indian tribe" to mean *inter alia* an organized group or community of Indians 1) whose members have been lawfully recognized by the secretary of the interior as eligible for the special programs and services provided by the United States to Indians because of their status as Indians and 2) that has been lawfully recognized

7

"as possessing powers of self-government."

17. Section 4(4) of the IGRA, 25 U.S.C. 2703(4), defines "Indian lands" to mean *inter alia* land whose title is held by an individual Indian subject to restriction by the United States against alienation and "over which an Indian tribe exercises governmental power."

18. Section 4(7) of the IGRA, 25 U.S.C. 2703(7), defines "class II gaming" to mean *inter alia* bingo, the sale of pull-tab cards, and certain non-banked card games.

**Indian Country**

19. 18 U.S.C. 1151 defines "Indian country" to mean

    (a) all land within the limits of any Indian reservation under the jurisdiction of the United States Government, notwithstanding the issuance of any patent, and, including rights-of-way running through the reservation,

    (b) all dependent Indian communities within the borders of the United States whether within the original or subsequently acquired territory thereof, and whether within or without the limits of a state, and

    (c) all Indian allotments, the Indian titles to which have not been extinguished, including rights-of-way running through the same.

**Alaska Native Allotment Act**

20. The Alaska Native Allotment Act (ANAA), 43 U.S.C. 270-1 to 270-3 (repealed 1971), which Congress enacted in 1906, amended in 1956, and repealed in 1971, authorized the Secretary of the Interior to allot not to exceed 160 acres of nonmineral, vacant, unappropriated, and unreserved federally-owned land in Alaska to any Indian, Eskimo, or Aleut of full or mixed blood who was the head of a family or was twenty-one years of age or older as the homestead of the allottee and his or her heirs in perpetuity, if the allottee first demonstrated by proof satisfactory to the Secretary that he or she had made "substantially continuous use and occupancy of the land for a period of five years." The ANAA also provided that an allottee could not convey the title to his or her allotment to a third party unless the Secretary of the Interior approved the conveyance.

FACTUAL BACKGROUND

**Indian Tribe**

21. On or about 1897 several families whose members were of Dena'ina Athabascan Indian descent who had been residing in the vicinity of Knik relocated to a site two miles above the mouth of the Eklutna River, which empties into Cook Inlet twenty-six miles north of what today is downtown Anchorage. The cluster of log cabins they constructed became known as the community of Eklutna.

22. The 1970 U.S. Census recorded that the community of Eklutna had twenty-five residents, most if not all of whom were of one-fourth degree or more Dena'ina Athabascan Indian blood quantum. As a consequence, in 1971 in section 11(b)(1) of the Alaska Native Claims Settlement Act (ANCSA), 43 U.S.C. 1609(b)(1), Congress designated the community of Eklutna as a "Native village" to enable residents of the community who were of one-fourth degree or more Dena'ina Athabascan Indian blood quantum to incorporate Eklutna, Inc., and to enable Eklutna, Inc., to be eligible for the monetary and land ownership benefits that ANCSA made available.

23. In 1884 Congress decided that it would not designate any group in Alaska whose membership was composed of individuals of Alaska Native descent as a "federally recognized tribe," which as a consequence of that legal designation would possess powers of self-government. In 1932 Secretary of the Interior Ray Lyman Wilbur described Congress's Alaska Native policy to that date as follows: "The United States has had no treaty relations with any of the aborigines of Alaska nor have they been recognized as the independent tribes with a government of their own. The individual native has always and everywhere in Alaska been subject to the white man's law, both Federal and territorial, civil and criminal." And in 1988 the Alaska Supreme Court described Congress's Alaska Native policy to that date as follows: "In a

10

series of enactments following the Treaty of Cession and extending into the first third of this century, Congress has demonstrated its intent that Alaska Native communities not be accorded sovereign tribal status. The historical accuracy of this conclusion was expressly recognized in the proviso to the Alaska Indian Reorganization Act [of 1936] . . . No enactment subsequent to the Alaska Indian Reorganization Act granted or recognized tribal sovereign authority in Alaska."

24. In 1975 Congress enacted the Indian Self-Determination and Education Assistance Act (ISDEAA), a statute that authorized the Bureau of Indian Affairs (BIA) and Indian Health Service (IHS) to contract with an "Indian tribe" to enable the tribe to administer programs and services that the BIA and the IHS had been providing to the tribe's members because of the members's status as Indians. Section 4(b) of the ISDEAA, 25 U.S.C. 5304(e), defined "Indian tribe" to mean

> any Indian tribe, band, nation, or other organized group or community, including any Alaska Native village or regional or village corporation as defined in or established pursuant to the Alaska Native Claims Settlement Act, which is recognized as eligible for the special programs and services provided by the United States to Indians because of their status as Indians.

11

25. The ISDEAA did not identify the groups and communities whose members were section 4(b) "Indian tribes." But in 1979 Assistant Secretary of the Interior for Indian Affairs Forrest Gerard published in the *Federal Register* a list of "Indian Tribal Entities That Have a Government-to-Government Relationship With the United States," which identified those groups and communities that were located in the coterminous states.

26. Because the "Indian tribe" definition in section 4(b) of the ISDEAA included within its purview Alaska Native villages established pursuant to the Alaska Native Claims Settlement Act, in 1982 when he republished the 1979 list in the *Federal Register*, Assistant Secretary of the Interior for Indian Affairs Ken Smith published a separate list of "Alaska Native Entities Recognized and Eligible to Receive Services From the United States Bureau of Indian Affairs." In the preamble that preceded the list Assistant Secretary Smith explained that "While eligibility for services administered by the Bureau of Indian Affairs is generally limited to historical tribes and communities of Indians residing on reservations, and their members, unique circumstances have made eligible additional entities in Alaska that are not historical tribes." One of the listed Alaska Native Entities was "Eklutna Native Village."

27. In 1983, 1985, and 1986 the list of Alaska Native Entities described in paragraph no. 26 was republished in the

*Federal Register*. Each of those lists included "Eklutna Native Village."

28. Because, in addition to Alaska Native villages, the "Indian tribe" definition in section 4(b) of the ISDEAA also included within its purview regional and village corporations established pursuant to the Alaska Native Claims Settlement Act, in 1988 when Assistant Secretary of the Interior for Indian Affairs Ross Swimmer republished in the *Federal Register* the list of Alaska Native Entities, in addition to "Eklutna" and other communities that had been designated as a "Native village" for the purposes of ANCSA, he included ANCSA village and regional corporations on the list, one of which was "Eklutna, Inc."

29. In 1982 a political movement began in the Alaska Native community whose organizing tenets were that Alaska Native residents of the community of Eklutna and all other ANCSA Native villages were, and had always been, members of federal recognized tribes, that the land within and surrounding each Native village was "Indian country" as 18 U.S.C. 1151 defines that term, and that within the boundaries of that Indian country each federally recognized tribe possessed powers of self-government. The leaders of that movement were represented by a small group of attorneys whose two most influential members were Robert Anderson, an attorney employed in the Anchorage office of the Native American Rights Fund (NARF), and Lloyd Miller, the head of the Anchorage

13

office of the Sonosky Chambers law firm.

30. In June 1993 President Bill Clinton nominated, and in July 1993 the Senate confirmed, Ada Deer as Assistant Secretary of the Interior for Indian Affairs. Prior to her nomination Assistant Secretary Deer had been a member of the staff of, and then Chairwoman of the Board of Directors of, NARF, the organization that employed Robert Anderson.

31. Three months after she was confirmed, on October 21, 1993 Assistant Secretary Deer published in the *Federal Register* a new list of "Native Entities Within the State of Alaska Recognized and Eligible to Receive Services From the United States Bureau of Indian Affairs" that included "Eklutna Native Village." But Assistant Secretary Deer removed from her list Eklutna, Inc., and the other ANCSA village and regional corporations that Assistant Secretary Swimmer had included in the list he had published in the *Federal Register* in 1988. She did so because, as Assistant Secretary Deer explained in a preamble that preceded her list, she intended her act of publication "to eliminate any doubt as to the Department [of the Interior]'s intention by expressly and unequivocally acknowledging that the Department has determined that the [listed] villages and regional tribes . . . are distinctly Native communities and have the same status as tribes in the contiguous 48 states." The preamble also announced that the listed village and regional tribes

14

are not simply eligible for services [from the BIA and IHS], or recognized as tribes for certain narrow purposes. Rather, they have the same governmental status as other federally acknowledged Indian tribes by virtue of their status as Indian tribes with a government-to-government relationship with the United States; are entitled to the same protection, immunities, privileges as other acknowledged tribes; have the right, subject to general principles of Indian law, to exercise the same inherent and delegated authorities available to other tribes; and are subject to the same limitations imposed by law on other tribes.

In the preamble Assistant Secretary Deer cited 25 U.S.C. 2 and 9 as the statutes in which Congress had delegated her authority to unilaterally abrogate Congress's Alaska Native policy more than a century old and create more than two hundred federally recognized tribes in Alaska simply by publishing a list of Native Entities in the *Federal Register*.

32. Behind the scene, Assistant Secretary of the Interior for Indian Affairs Ada Deer was put up to trying to create more than two hundred federally recognized tribes in Alaska simply by publishing the list of Native Entities and preamble described in paragraph no. 31 by Robert Anderson and Lloyd Miller, the attorneys referenced in paragraph no. 29. Three months before

Assistant Secretary Deer was nominated Mr. Anderson sent Mr. Miller and the other attorneys referenced in paragraph no. 29 a memorandum in which he reported

> Please find for your review a draft letter to the Assistant Secretary, a draft 1993 *Federal Register* List of Federally Recognized Tribes in Alaska and a draft Explanation and Rationale for the new list. We have been in contact with Scott Keep [an Assistant Solicitor in the Division of Indian Affairs in the Office of the Solicitor at the Department of the Interior in Washington, D.C.] and he believes the time is right to follow up on our letter to Secretary [of the Interior Bruce] Babbitt. The plan is to get [Assistant Secretary of the Interior for Indian Affairs] Eddie Brown (who is still in office) to direct the Bureau [of Indian Affairs] to review the proposed new Federal Register list and come up with its own draft list, and to give this matter priority starting *now*! . . . We plan to have John Ecohawk [the executive director of NARF] ask Bruce Babbitt to *direct* Eddie Brown to take this action, if necessary . . . So *now* is the time to strike! (emphases in original).

33. After Assistant Secretary Deer was confirmed, with her approval, inside the Department of the Interior Messrs. Anderson

16

and Miller's plan proceeded. John Treise, the Deputy Associate Solicitor of the Department of the Interior for the Division of Indian Affairs, sent Messrs. Anderson and Miller a draft copy of a new list of Native Entities and accompanying preamble for their review and comment. On September 30, 1993 Mr. Miller sent Deputy Associate Solicitor Treise a fax in which he stated

> John, I think the redraft is excellent, and I am glad the NARF submission we all worked on was helpful. I have proposed a sentence for page 3, and made a comment on page 5, a correction on page 6, and joined in Bob [Anderson]'s correction on page 7.

Three weeks later Assistant Secretary Deer published in the *Federal Register* her new list and preamble.

34. The Klawock Cooperative Association (KCA) was one of the Native Entities on the list of Native Entities that on October 21, 1993 Assistant Secretary of the Interior for Indian Affairs Ada Deer published in the *Federal Register*. Two months before Assistant Secretary Deer published her list, in August 1993 the KCA requested Anthony Hope, the Chairman of the National Indian Gaming Commission, to approve a gaming ordinance that would authorize the KCA to operate a casino that would offer class II games in a former salmon cannery that the BIA had purchased for the KCA in 1950. In response, Michael Cox, the General Counsel of the NIGC, asked the Solicitor of the Department of the Interior

17

whether the members of the KCA were an "Indian tribe" as section
4(5) of the IGRA, 25 U.S.C. 2703(5), defined that term. In an
opinion letter dated November 15, 1993 Associate Solicitor for
the Division of Indian Affairs Michael Anderson advised General
Counsel Cox that the members of the KCA were a section 4(5)
"Indian tribe" because "The KCA has been included on all lists of
Alaska Native entities recognized and eligible to receive
services has (sic) published by the Department [of the Interior],
beginning with the first such list published in 1982. Most
recently, the KCA was included in the October 21, 1993, list of
Alaska tribal entities . . . ." On the basis of that opinion
letter, to the present day chairmen and women of the NIGC have
assumed that the members of each of the Native Entities on the
1993 and succeeding lists, including defendant Native Village of
Eklutna, are members of an "Indian tribe" as section 4(5) of the
IGRA defines that term.

**Indian Lands**

35. John Ondola was an individual of Dena'ina Athabascan
Indian descent who had been born in 1897 in the Copper River area
of Alaska. In 1914 Congress authorized the Alaska Engineering
Commission (AEC) to construct, and then operate, a railroad from
tidewater at Seward to Fairbanks in the Alaska interior. In 1920
the AEC hired John Ondola to assist with the construction. In
1923 when the trains began running John Ondola continued his

employment with the Alaska Railroad and was assigned to maintain the section of track that runs through what today is the Birchwood Spur Road neighborhood in the Municipality of Anchorage. In the late 1920s John Ondola married Olga Alex, a woman of Dena'ina Athabascan Indian descent who had been born in 1911 in the community of Eklutna. In 1930 John Ondola constructed a house on federally-owned land adjacent to the section of track for whose maintenance he was responsible and in which he resided with Olga Ondola until his death in 1944, and in which Olga Ondola continued to reside until her death in 1965. During their marriage John and Olga Ondola had ten children, two of whom died before reaching adulthood.

36. Pursuant to the Alaska Native Allotment Act, in 1963 the Bureau of Land Management issued a certificate of allotment to Olga Ondola that conveyed to her, subject to a restraint on alienation, fee title to an 8.05-acre parcel of land on which was located the house in which Olga Ondola had resided since 1930 (hereinafter "Ondola allotment"). Olga Ondola's heirs have leased the Ondola allotment to defendant Native Village of Eklutna for the purpose of enabling the NVE to construct, and the Marnell Gaming Management Company to manage, a casino on the allotment.

37. Nine days before he and other members of the George H. W. Bush administration departed the Department of the Interior, on January 11, 1993 Thomas Sansonetti, the Solicitor

of the Department of the Interior, issued Solicitor's
Opinion M-36975 (Governmental Jurisdiction of Alaska Native
Villages Over Land and Members). The opinion announced that

> While the Department [or the Interior]'s position with
> regard to the existence of tribes in Alaska may have
> vacillated between 1867 and the opening decades of this
> century, it is clear that for the last half century,
> Congress and the Department have dealt with Alaska
> Natives as though there were tribes in Alaska.

But the opinion then concluded that it was not necessary "to
determine which Native villages in Alaska are tribes."

38. Solicitor's Opinion M-36975 also announced, without any
explanation of the analysis that supported the conclusion, that
the Eightieth Congress, which in 1948 had enacted the 18 U.S.C.
1151 definition of the term "Indian country," had intended the
undefined term "Indian allotments" contained therein to include
within its purview allotments that the Secretary of the Interior
had issued pursuant to the Alaska Native Allotment Act. But the
opinion then concluded that no "specific villages or groups can
claim jurisdictional authority over allotment parcels" because
"in the absence of a tribal territorial base (e.g., a
reservation), there is little to no basis for an Alaska village
claiming *territorial* jurisdiction over an Alaska Native
allotment." (emphasis in original).

20

39. In 1995 defendant Native Village of Eklutna entered into an agreement with Jack Binion, the president of Binion's Horseshoe Casino in Las Vegas, Nevada, pursuant to which Binion paid the NVE $100,000 for the right to construct and then manage a casino on the Ondola allotment. To that end, represented by Lloyd Miller and other attorneys in the Anchorage office of the Sonosky Chambers law firm, the NVE submitted a gaming ordinance to Harold Monteau, the Chairman of the National Indian Gaming Commission, that, had it been approved, would have authorized defendant NVE to operate a casino on the Ondola allotment that offered class II games. Michael Cox, the General Counsel of the NIGC, then asked the Associate Solicitor of the Department of the Interior for the Division of Indian Affairs to render a legal opinion as to whether the Ondola allotment was "Indian lands," as that term is defined in section 4(4) of the IGRA.

40. On May 17, 1995 the Associate Solicitor of the Department of the Interior for the Division of Indian Affairs, by letter, informed General Counsel Cox that, for the reasons Solicitor Sansonetti had set out in Solicitor's Opinion M-36975 the Associate Solicitor was not convinced "that the Eklutna Indian Tribe exercise governmental power over the land," and, as a consequence, he could not "conclude that the land in question is 'Indian land' as defined by IGRA." On information and belief, before the Associate Solicitor sent General Counsel Cox the

aforementioned letter he informed Lloyd Miller or another attorney in the Anchorage office of the Sonosky Chambers law firm of the content of the letter. Because on May 18, 1995 the Associate Solicitor sent General Counsel Cox a second letter in which he misdescribed his May 17, 1995 letter as a "draft" and informed General Counsel Cox that - because the Associate Solicitor had "received correspondence from the Eklutna Tribe dated May 16, 1995, withdrawing their request for your office's review of their ordinance" - whether the Ondola allotment qualified as IGRA section 4(4) "Indian lands" "was no longer ripe for decision in your office," and, as a consequence, the legal opinion the Associate Solicitor had rendered in the May 17, 1995 letter "was not finalized and will not be issued." The Associate Solicitor then requested General Counsel Cox to inform anyone to whom he had given a copy of the May 17, 1995 letter that the legal opinion that had been issued actually had not been issued and the "draft" opinion was not binding. The Associate Solicitor who performed that favor for defendant NVE and its attorneys was Robert Anderson, the attorney referenced in paragraph nos. 29 and 32 who had been employed by NARF until a month earlier when Secretary of the Interior Bruce Babbitt had appointed Mr. Anderson as Associate Solicitor.

41. On April 2, 2007 defendant Native Village of Eklutna, represented by Lloyd Miller and other attorneys in the Anchorage

22

office of the Sonosky Chambers law firm, tried again by submitting a gaming ordinance to Philip Hogen, the Chairman of the National Indian Gaming Commission, that, had it been approved, would have authorized the NVE to operate a casino on the Ondola allotment that offered class II games. Penny Coleman, the General Counsel of the NIGC, asked the State of Alaska to submit written comments regarding whether Chairman Hogen should approve the ordinance. On May 17, 2007 Senator Lydia Green, the President of the Alaska Senate, and Representative John Harris, the Speaker of the Alaska House of Representatives, submitted written comments and attached exhibits to Chairman Hogen in which they demonstrated that the members of defendant NVE were not an IGRA Section 4(5) "Indian tribe" and, if arguendo they were, that the Ondola allotment did not qualify as IGRA Section 4(4) "Indian lands." On June 25, 2007 Marissa Flanney, an attorney employed in the Anchorage office of the Sonosky Chambers law firm, informed Chairman Hogen that defendant NVE was withdrawing "the Tribe's Amended and Restated Gaming Ordinance and the Indian land determination that was submitted for your approval on April 2, 2007. The Tribe will be resubmitting a substitute ordinance shortly."

42. Shortly was nine years. On June 29, 2016 defendant Native Village of Eklutna tried a third time by petitioning the Department of the Interior to make a determination that the

23

Ondola allotment qualified as IGRA Section 4(4) "Indian lands."
When defendant NVE apparently received informally the same
response it had received in 1995 as described in paragraph no.
40, on November 21, 2016 defendant NVE requested Solicitor of the
Department of the Interior Hilary Tompkins to withdraw
Solicitor's Opinion M-36975. Solicitor Tompkins and her successor
in 2017, Solicitor of the Department of the Interior Daniel
Jorjani, both declined to do so. And on June 18, 2018 John
Tahsuda, the Principal Deputy Assistant Secretary of the Interior
for Indian Affairs, issued a decision in which he announced that
"I have determined that the [Ondola allotment] does not
constitute 'Indian lands' and is therefore ineligible for gaming
under IGRA . . . ."

43. On August 7, 2019 defendant Native Village of Eklutna,
represented by attorneys from the Sonosky Chambers law firm,
filed a civil action in the U.S. District Court for the District
of Columbia in which defendant NVE requested the court to enter a
"declaratory judgment reversing the Department [of the
Interior]'s negative Indian lands determination and declaring
that the [Ondola] Allotment constitutes 'Indian lands' within the
meaning of 25 USC 2703(4)." On September 22, 2021 District Judge
Dabney Friedich issued a memorandum decision in which she held
that Solicitor Sansonetti's conclusion in Solicitor's Opinion M-
36975 that the members of the federally recognized tribes in

24

Alaska (which Judge Friedich assumed existed) did not possess powers of self-government within the boundaries of allotments that had been issued pursuant to the Alaska Native Allotment Act "was valid in the first instance and remains so." Defendant NVE did not appeal that conclusion of law to the U.S. Court of Appeals for the District of Columbia Circuit.

44. With no explanation as to why or who had requested him to do so, on February 1, 2024 the Solicitor of the Department of the Interior issued Solicitor's Opinion M-37079 in which he withdrew Solicitor's Opinion M-36975 insofar as the opinion had concluded that federally recognized tribes in Alaska did not possess powers of self-government within the boundaries of allotments issued pursuant to the Alaska Native Allotment Act. After announcing that that conclusion was "unpersuasive on the merits" and could not "be reconciled with subsequent case law," and that the memorandum decision Judge Friedich had issued in 2021 regarding the Ondola allotment had been erroneous "in both its reasoning and its ultimate conclusion," the Solicitor announced that henceforth "tribes in Alaska [would be] presumed to have jurisdiction over Native allotments," unless an allotment was owned by a non-tribal member or the location of an allotment was "geographically removed from the tribal community." The Solicitor of the Department of the Interior who issued Solicitor's Opinion M-37079 was Robert Anderson, the attorney

25

referenced in paragraph nos. 29, 32, and 40 who in April 2021 President Biden had nominated, and in October 2021 the Senate had confirmed, as Solicitor.

45. Represented by attorneys in the Sonosky Chambers law firm, on April 22, 2024 defendant Native Village of Eklutna submitted to defendant Avery for her review pursuant to section 11(b) of the IGRA, 25 U.S.C. 2710(b), a new gaming ordinance whose approval by defendant Avery would authorize the NVE to engage in class I and class II gaming in a casino that would be located on the Ondola allotment. Defendant NVE also requested confirmation that the Ondola allotment qualified as IGRA Section 4(4) "Indian lands." On May 13, 2024 Rea Cisneros, the Acting General Counsel of the NIGC, asked the Solicitor of the Department of the Interior to revisit the decision Principal Deputy Assistant Secretary of the Interior for Indian Affairs John Tahsuda had made on June 18, 2018 in which he had concluded that the Ondola allotment did not qualify as "Indian lands." On June 27, 2024 Eric Shepard, the Associate Solicitor of the Department of the Interior for the Division of Indian Affairs, advised Acting General Counsel Cisneros that "The Ondola Allotment is 'Indian country' within the meaning of 18 U.S.C. 1151(c)" and, based on the new legal standard that Solicitor Robert Anderson had announced four months earlier in Solicitor's Opinion M-37079, the Ondola allotment "constitutes Indian lands

26

eligible for gaming by the Tribe under IGRA." On July 18, 2024 defendant Avery informed Aaron Leggett, the President of defendant NVE, that Associate Solicitor Shepard had "found that the Ondola allotment as currently held by the members of the Tribe constitutes Indian lands eligible for gaming by the Tribe under IGRA," and "I agree with this analysis and have adopted the opinion into my approval of the Tribe's Gaming Ordinance." Defendant Avery then informed President Leggett: "The Ordinance is approved as it is consistent with IGRA and NIGC regulations."

46. On or about 2016 the Marnell Gaming Management Company, headquartered in Las Vegas, Nevada, signed a contract with defendant Native Village of Eklutna in which the company agreed to invest $30 million to enable defendant NVE to construct a 50,000 square foot casino on the Ondola allotment that the company then will manage and whose gaming floor will contain seven hundred video gaming machines whose software will be programed to play bingo, pull-tabs, and other class II forms of gambling. Less than two months after defendant Avery approved the gaming ordinance described in paragraph no. 45, in September 2024 defendant NVE began clearing the Ondola allotment of timber in order to begin construction of the casino.

### FIRST CLAIM FOR RELIEF

47. Plaintiffs incorporate paragraph nos. 1 through 46 by reference.

48. The Indian Commerce Clause of the U.S. Constitution grants Congress exclusive plenary authority to, through its enactment of a statute or the Senate's ratification of a treaty, recognize a group of Native Americans, including a group of individuals of Alaska Native descent, as a "federally recognized tribe" whose governing body, as a consequence of that legal designation, possesses powers of self-government. The Indian Commerce Clause also grants Congress authority to enact a statute that delegates the Secretary of the Interior authority to exercise Congress's Indian Commerce Clause authority in Congress's stead by recognizing a group of Native Americans, including a group of individuals of Alaska Native descent, as a "federally recognized tribe."

49. On October 21, 1993 Assistant Secretary of the Interior for Indian Affairs Ada Deer published in the *Federal Register* a list of "Native Entities Within the State of Alaska Recognized and Eligible to Receive Services From the United States Bureau in Indian Affairs," one of which was the "Native Village of Eklutna." Assistant Secretary Deer also announced that her act of publication of her list had the legal consequence of designating the members of each of the listed entities as a federally recognized tribe that henceforth had "the same [legal] status as tribes in the 48 contiguous states" and "the same governmental status as other federally acknowledged Indian tribes." Assistant

Secretary Deer further announced that 25 U.S.C. 2 and 9 were the statutes in which Congress had delegated her authority to create - simply by publishing a list of Native Entities in the *Federal Register* - more than two hundred federally recognized tribes in Alaska on her own and in Congress's stead. To the present day, Assistant Secretary Deer's successors as Assistant Secretary, most recently Assistant Secretary of the Interior for Indian Affairs Bryan Newland on January 8, 2024, have continued in the *Federal Register* to cite 25 U.S.C. 2 and 9 as the statutes in which Congress delegated Assistant Secretary Deer authority to create - simply by publishing a list of Native Entities in the *Federal Register* - more than two hundred federally recognized tribes in Alaska in Congress's stead.

50. The Twenty-Second Congress enacted 25 U.S.C. 2 in 1832 and the Twenty-Third Congress enacted 25 U.S.C. 9 in 1834. On its face, the text of neither statute delegates to the Secretary of the Interior authority to create federally recognized tribes in Congress's stead. As a consequence, the final agency action described in paragraph nos. 31 and 33 that Assistant Secretary of the Interior for Indian Affairs Ada Deer purported to take on October 21, 1993 was *ultra vires* and void *ab initio*. Because it was, the members of defendant Native Village of Eklutna are not a federally recognized tribe whose governing body possesses powers of self-government. And because the governing body does not, the

29

members of defendant NVE are not an IGRA Section 4(5) "Indian tribe" that is eligible to conduct gaming pursuant to the Indian Gaming Regulatory Act.

## SECOND CLAIM FOR RELIEF

51. Plaintiffs incorporate paragraph nos. 1 through 46 by reference.

52. Congress may delegate its legislative power to an executive branch official or department. But pursuant to the constitutional doctrine of separation of powers, the text of a statute in which Congress does so must contain judicially identifiable and enforceable standards that control the exercise of the delegated authority.

53. If *arguendo* in 1832 the Twenty-Second Congress intended 25 U.S.C. 2 and in 1834 the Twenty-Third Congress intended 25 U.S.C. 9 to delegate the Secretary of the Interior authority to create federally recognized tribes in Congress's stead, the text of neither statute contains judicially identifiable and enforceable standards that control the exercise of the delegated authority. As a consequence, the final agency action described in paragraph nos. 30 and 31 that Assistant Secretary of the Interior for Indian Affairs Ada Deer purported to take on October 21, 1993 was *ultra vires* and void *ab initio*. Because it was, the members of defendant Native Village of Eklutna are not a federally recognized tribe whose governing body possesses powers of self-

30

government. And because the governing body does not, the members of defendant NVE are not an IGRA Section 4(5) "Indian tribe" that is eligible to conduct gaming pursuant to the Indian Gaming Regulatory Act.

**THIRD CLAIM FOR RELIEF**

54. Plaintiffs incorporate paragraph nos. 1 through 46 by reference.

55. A group of Native Americans, including a group of individuals of Alaska Native descent, that has been lawfully designated by Congress or by the Secretary of the Interior as a federally recognized tribe possesses powers of self-government only within the tribe's "Indian country."

56. In 1948 the Eightieth Congress enacted a definition of the term "Indian country," now codified at 18 U.S.C. 1151. The definition *inter alia* designates as "Indian country" "Indian allotments, the Indian titles to which have not been extinguished."

57. In 1948 the Eightieth Congress did not intend to include within the purview of the term "Indian allotments" allotments that the Secretary of the Interior had issued pursuant to the Alaska Native Allotment Act.

58. For the reason set out in paragraph no. 57 the Ondola allotment is not "Indian country." As a consequence, if *arguendo* the members of defendant Native Village of Eklutna are an "Indian

31

tribe" as section 4(5) of the IGRA defines that term, the Ondola allotment is not "Indian country" within whose boundaries defendant NVE possesses powers of self-government, and the Ondola allotment is not IGRA Section 4(4) "Indian lands" on which section 11(b) of the Indian Gaming Regulatory Act, 25 U.S.C. 2710(b), delegates defendant Avery authority to approve a gaming ordinance that authorizes defendant NVE to engage in class II gaming on the Ondola allotment.

**FOURTH CLAIM FOR RELIEF**

59. Plaintiffs incorporate paragraph nos. 1 through 46 by reference.

60. If *arguendo* in 1948 the Eightieth Congress did intend to include within the purview of the term "Indian allotments" in 18 U.S.C. 1151 allotments that the Secretary of the Interior had issued pursuant to the Alaska Native Allotment Act, the only Alaska Native allotments that are section 1151 "Indian country" are those allotments "the Indian titles to which have not been extinguished."

61. "Indian title" and "aboriginal title" are synonymous legal terms of art that have the same meaning.

62. In 1971 in section 4(b) of the Alaska Native Claims Settlement Act, 16 U.S.C. 1603(b), the Ninety-Second Congress extinguished "All aboriginal titles, if any, and all claims of aboriginal title in Alaska based on use and occupancy, including

32

submerged land underneath all water areas, both inland and offshore." As a consequence, if *arguendo* it had ever existed, the Indian title under the Ondola allotment was extinguished in 1971, the Ondola allotment is not "Indian country" and is not IGRA Section 4(4) "Indian lands," and defendant Avery had no authority pursuant to section 11(b) of the Indian Gaming Regulatory Act, 25 U.S.C. 2710(b), to approve a gaming ordinance that authorizes defendant NVE to engage in class II gaming on the Ondola allotment.

**PRAYER**

WHEREFORE the plaintiffs request that the court:

1. Enter a declaratory judgment which declares that

    a. neither Congress nor the Secretary of the Interior nor the Assistant Secretary of the Interior for Indian Affairs (acting pursuant to authority that that Congress has delegated to the Secretary) has recognized the members of defendant Native Village of Eklutna to be a "federally recognized tribe" whose governing body, as a consequence of that designation, possesses powers of self-government;

    b. the members of defendant Native Village of Eklutna are not an "Indian tribe" as section 4(5) of the Indian Gaming Regulatory Act defines that term;

33

c. the Ondola allotment is not 18 U.S.C. 1151(c) "Indian country" and is not "Indian lands" as section 4(4) of the Indian Gaming Regulatory Act defines that term; and

d. the final agency action taken on July 18, 2024 by defendant Avery in which defendant Avery approved a gaming ordinance that defendant Native Village of Eklutna had submitted to the National Indian Gaming Commission on April 22, 2024 was *ultra vires* and void *ab initio* and is set aside because the action was taken in excess of defendant Avery's statutory authority;

2. Award the plaintiffs their costs and, pursuant to the Equal Access to Justice Act, a reasonable attorney's fee; and

3. Award the plaintiffs such other and further relief as the court deems just.

DATED: December 16, 2024

Respectfully Submitted,

s/ Donald Craig Mitchell

_____

DONALD CRAIG MITCHELL
Alaska Bar No. 7605046

Attorney for Plaintiffs